IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED
IN OPEN COURT

OCT – 3 2017

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:17-CR-222 |
| v. | Count 1: 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) |
| WILLIAM S. WILSON, also known as "Bill," TIMOTHY R. DONELSON, and MATTHEW KEKOA LUMHO, | Counts 2 – 4: 18 U.S.C. § 1343 (Wire Fraud) |
| Defendants. | Counts 5 – 9: 18 U.S.C. § 287 (False Claims) |
| | Count 10: 18 U.S.C. § 201(b)(1)(A) (Bribery of a Public Official) |
| | Count 11: 18 U.S.C. § 201(b)(2)(A) (Acceptance of Bribes by a Public Official) |
| | Counts 12 – 13: 18 U.S.C. § 1001 (False Statements) |
| | Forfeiture Notice |

## INDICTMENT

October 2017 Term - at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

### GENERAL ALLEGATIONS

Unless otherwise noted, at all times relevant to this indictment:

1.    Defendant WILLIAM S. WILSON, also known as "Bill," ("WILSON") owned and operated Corporation A, a Florida corporation based in Lake Butler, Florida.

2.    Corporation A specialized in construction work related to the installation of fiber-optic cables.  Prior to 2011, Corporation A had no experience or expertise in providing

1

information technology support services, and had never acted as a reseller of computers or computer-related equipment.

3.    WILSON also controlled and operated Corporation B, a Florida corporation based in Lake Butler, Florida, which he owned in whole or in part.

4.    Corporation B specialized in the construction and maintenance of cellular telephone transmission towers. Prior to 2011, Corporation B had no experience or expertise in providing information technology support services, and had never acted as a reseller of computers or computer-related equipment.

5.    Corporation C was a company that provided, among other things, telecommunications services. Corporation C had offices in McLean, Virginia, within the Eastern District of Virginia, and elsewhere.

6.    Defendant TIMOTHY R. DONELSON ("DONELSON") was an employee of Corporation C, and worked primarily in Corporation C's offices in McLean, Virginia, within the Eastern District of Virginia. DONELSON was employed as a senior director and then as a vice president within Corporation C's federal markets group. As its employee, DONELSON owed a fiduciary duty to Corporation C.

7.    Corporation D was a corporation based in Virginia owned by DONELSON.

8.    Ronald A. Capallia, Jr. ("Capallia") was an employee of Corporation C, and worked primarily in Corporation C's offices in McLean, Virginia, within the Eastern District of Virginia. Capallia was employed as a program manager and then as a senior manager within Corporation C's federal markets group. In this role, Capallia reported indirectly to DONELSON. As its employee, Capallia owed a fiduciary duty to Corporation C.

9.    Individual A was Capallia's spouse.

2

10.     The Department of Defense was a department and agency of the United States Government.

11.     The Office of the Inspector General of the Department of Defense ("DOD OIG") was an office within the Department of Defense. The DOD OIG had jurisdiction over, among other things, investigating, detecting, and preventing fraud, waste, and abuse in the programs and operations of the Department of Defense. The DOD OIG had its headquarters in Arlington, Virginia, and subsequently in Alexandria, Virginia, both within the Eastern District of Virginia.

12.     Defendant MATTHEW KEKOA LUMHO was an employee of the DOD OIG and a "public official" within the meaning of 18 U.S.C. § 201(a)(1). LUMHO was the Chief of the Unified Communications Division of the Information Systems Directorate, which subsequently was renamed the Office of the Chief Information Officer, a branch of the DOD OIG. As a public official and an employee of the DOD OIG, LUMHO owed a fiduciary duty to the DOD OIG and to the United States.

13.     Individual B was LUMHO's father-in-law.

14.     The Washington Interagency Telecommunications System ("WITS 3") was a contract issued by the General Services Administration ("GSA") to multiple vendors on or about November 8, 2007 (hereinafter, "the WITS 3 contract"). Corporation C was one of the vendors to whom the WITS 3 contract was awarded. The WITS 3 contract was an indefinite delivery, indefinite quantity contract with fixed unit prices, meaning that federal agencies ordering goods or services under the WITS 3 contract could order as much or as little of goods or services within the scope of the contract from WITS 3 vendors, including Corporation C, as that agency required, and do so at fixed rates. Any federal agency located in the National Capitol Region, including the DOD OIG, could order services under the WITS 3 contract.

15.     The goods and services available under the WITS 3 contract included telecommunications services such as voice and data services, internet access services, customer premises equipment ancillary to the provision of telecommunications services, information technology services, and professional services related to the provision of telecommunications services.

16.     The prices of goods and services available from vendors under the WITS 3 contract, including from Corporation C, were based on the amount and type of goods or services being ordered. Each category of goods or services available under the WITS 3 contract was designated by a Contract Line Item Number ("CLIN") that had an identifying number and a per-unit price associated with the good or service being ordered.

17.     Federal agencies using the WITS 3 contract could also attempt to negotiate prices that were more favorable than the default rates associated with each CLIN by conducting a "fair opportunity process." Under that process, federal agencies had the option of requesting competing proposals from the vendors on the WITS 3 contract to evaluate the cost and value to the agency of ordering services from one vendor versus another.

18.     On or about July 1, 2009, after conducting a "fair opportunity process," the Defense Telecommunications Services-Washington selected a company other than Corporation C as the provider for WITS 3 voice and data services in the National Capitol Region.

19.     One of the categories of services available under the WITS 3 contract was a "cable installer." The WITS 3 contract defined the duties of a "cable installer," in relevant part, as follows:

> Performs installation of telephone, coaxial, and fiber optic cables, including
> vertical and horizontal cable pairs to the desktop. Locates and diagnoses signal

4

transmission defects using various test equipment and visual inspection. Uses
tools and related test equipment, ground power equipment, and pressure
equipment. Prepares necessary written reports. Communicates effectively with
technical and management personnel, as required.

20.     Another of the categories of services available under the WITS 3 contract was a

"LAN/WAN Integrator." The WITS 3 contract defined the duties of a "LAN/WAN Integrator,"

in relevant part, as follows:

Responsible for overall integration of WITS 3 service delivery arrangements
involving LANs and WANs including: the planning, design, installation,
maintenance, management and coordination of agency LAN/WAN interfaces with
the WITS 3 network (may include local, metropolitan, and wide area networks).
Has responsibility for technical architecture and recommendations related to
customer LANs/WANs. Maintains technical currency and studies vendor
products to determine those which best meet agency needs. Presents information
to management which may result in purchase and installation of hardware,
software, and telecommunication equipment. Contributes technically to complex
problems in the area of local and wide area networking, communications, and
related hardware/software (e.g., bridges, gateways, routers, multiplexers, hubs).
Recommends network security procedures and policies. Works with many
network topologies and protocols (e.g., IP, MPLS, Frame Relay) as well as with
multiple operating system environments (e.g., Desktop, Server, NOS).

21.     Each federal agency utilizing the WITS 3 contract was required to identify a

Designated Agency Representative to act on behalf of the agency with respect to the WITS 3

contract. The Designated Agency Representative was authorized to order services and purchase

customer premises equipment ancillary to the delivery of services through the WITS 3 contract

on behalf of his or her agency. In addition, the Designated Agency Representative was

responsible for approving each order, and for inspection and acceptance of the goods and

services ordered under the WITS 3 contract.

22.     Beginning no later than August 2011, defendant LUMHO served as a Designated

Agency Representative on behalf of the DOD OIG with respect to the WITS 3 contract. In that

capacity, LUMHO was responsible for approving and submitting orders for goods and services

5

through the WITS 3 contract on behalf of the DOD OIG, and for the inspection and acceptance of goods and services ordered and delivered to the DOD OIG under that contract.

23.     LUMHO also supervised, and therefore had the authority to give direction to, Public Official A.

24.     Public Official A was an employee of the DOD OIG and a "public official" within the meaning of 18 U.S.C. § 201(a)(1).  Public Official A served as a Telecommunications Specialist within the DOD OIG, and was the subordinate of and took direction from LUMHO.

25.     The DOD OIG also could acquire goods and services through several other governmental contract vehicles.  LUMHO had far less influence and control over the process by which goods and services were purchased through those other vehicles.

26.     Under the procedures established by Corporation C, when the DOD OIG wanted to order a particular good or service from Corporation C under the WITS 3 contract, the Designated Agency Representative acting on behalf of the DOD OIG would fill out a service order request form that listed, among other things, the Contract Line Item Number associated with the goods or services being ordered, a description of the goods or services being ordered, the quantity being ordered (typically stated in hours or months for services), the cost per unit, and the total cost of the goods or services being ordered.  The Designated Agency Representative would sign and date the form, and the form would then be uploaded to an online portal maintained by Corporation C, through which the order would be transmitted to Corporation C for fulfillment.

27.     Individual C was an employee of Corporation A.  Individual C also operated a Virginia corporation based in Ashburn, Virginia, that nominally was owned by Individual C's spouse, but was controlled by Individual C.

## COUNT 1

(Conspiracy To Commit Honest Services Wire Fraud and Money and Property Wire Fraud)

28.     Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated in this Count as if fully set forth herein.

29.     Beginning no later than July 2010, and continuing through at least July 2015, in the Eastern District of Virginia and elsewhere,

WILLIAM S. WILSON,
also known as "Bill,"
TIMOTHY R. DONELSON, and
MATTHEW KEKOA LUMHO,

defendants herein, along with Ronald A. Capallia, Jr., Individual C, and others known and unknown to the grand jury, did knowingly conspire and agree with each other, and others known and unknown to the grand jury, to commit certain offenses against the United States, namely:

a.     knowingly to devise and intend to devise a scheme and artifice to defraud by depriving another of the intangible right of honest services through bribes and kickbacks, and for the purpose of executing such scheme to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346;

b.     knowingly to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

7

## NATURE AND PURPOSES OF THE CONSPIRACY

The nature and purpose of the conspiracy included the following:

30. To provide for the unjust enrichment of the co-conspirators at the expense of the United States and Corporation C by offering, promising, demanding, giving, receiving, accepting, promising to give, and agreeing to receive kickbacks and bribes from WILSON or one of his companies directly and indirectly to DONELSON, Capallia, and LUMHO, in return for DONELSON and Capallia providing favorable treatment to WILSON's companies in connection with prime government contracts and subcontracts, including but not limited to favorable treatment in connection with the WITS 3 contract and subcontracts related to the WITS 3 contract, and in return for LUMHO performing official acts that benefitted WILSON's companies.

31. To make, present, and cause to be made and presented to the GSA and the DOD OIG claims and other documentation that WILSON, Capallia, and LUMHO knew to be false, fictitious, and fraudulent. The claims and other documentation falsely described the goods or services being provided, falsely inflated the number of hours of services being rendered, or billed the United States when no goods or services of any kind were provided. By presenting claims and other documents that were false in these ways, the co-conspirators enabled Corporation A to bill and be paid by Corporation C substantially in excess of what Corporation A otherwise could have billed for the goods or services actually provided, and likewise caused Corporation C to bill and be paid by the United States amounts substantially in excess of what the United States otherwise would have paid for the actual goods or services provided.

32. To conceal the corrupt nature of the kickbacks and bribes from WILSON to DONELSON, Capallia, and LUMHO, and to mask the falsity of the claims presented to the GSA

and DOD OIG, by the creation of false and fictitious documents, and the employment of false and deceptive pretenses.

## MANNER AND MEANS OF THE CONSPIRACY

33.    In furtherance of the conspiracy, and to accomplish its unlawful objects, the following methods and means were used, among others:

### Kickbacks from WILSON to DONELSON

34.    WILSON paid hundreds of thousands of dollars' worth of kickbacks directly and indirectly to DONELSON in return for DONELSON agreeing to arrange for and arranging for favorable treatment from Corporation C to Corporation A and Corporation B.  WILSON paid these kickbacks to DONELSON in several forms, including but not limited to the following:

a.    payments from Corporation A and Corporation B (companies owned and controlled by WILSON) to Corporation D (a company owned and controlled by DONELSON), the true nature of which were concealed through the use of false and fictitious invoices;

b.    funds from Corporation A used to pay for part of the purchase price of vehicles bought on behalf of DONELSON; and

c.    the purchase of real estate by Corporation A to benefit DONELSON.

35.    To conceal the corrupt nature of the kickbacks, WILSON and DONELSON created and caused the creation of false and fictitious invoices that purported to be from Corporation D, addressed to Corporation A and Corporation B, for services purportedly rendered or equipment purportedly supplied by Corporation D.  The false and fictitious invoices purported to describe work that had been done using construction equipment owned in whole or in part by DONELSON or Corporation D, when in fact, as DONELSON and WILSON knew,

DONELSON and Corporation D had supplied no equipment and performed no work to earn the payments demanded in the fraudulent invoices.

<u>Favorable Treatment From DONELSON to Companies Owned by WILSON</u>

36.     In return for the kickbacks DONELSON received from WILSON, DONELSON agreed to arrange for and did arrange for favorable treatment from Corporation C to Corporation A and Corporation B.  This favorable treatment included:

a.     signing a master service subcontract agreement between Corporation C and Corporation A, whereby Corporation A would act as a subcontractor to Corporation C in relation to the WITS 3 prime contract.  DONELSON entered into this master service subcontract agreement on behalf of Corporation C despite knowing that Corporation A had no experience or expertise related to information technology support services or in providing the other goods or services contemplated by the WITS 3 prime contract or the master service subcontract agreement;

b.     refraining from soliciting competing bids from other potential subcontractors on the WITS 3 contract, notwithstanding Corporation C's policy of seeking multiple bids or holding a formal competitive bidding process to the maximum extent practicable;

c.     executing an amendment to the master service subcontract agreement between Corporation C and Corporation A broadening the scope of the services that Corporation A could perform under that agreement, despite knowing that Corporation A lacked any relevant experience or expertise in providing the services contemplated by the amendment;

d.     signing various subcontract agreements and amendments to subcontract agreements between Corporation C and Corporation A, whereby Corporation A would install

and assist in the installation of fiber optic cables in relation to various contracts that Corporation C held directly or indirectly with the United States government and agencies thereof; and

    e.  signing various subcontract agreements and amendments to subcontract agreements between Corporation C and Corporation B, whereby Corporation B would install and assist in the installation of fiber optic cables in relation to various contracts that Corporation C held directly or indirectly with the United States government and agencies thereof.

Kickbacks from WILSON to Capallia

    37.  WILSON paid hundreds of thousands of dollars' worth of kickbacks directly and indirectly to Capallia in return for Capallia agreeing to arrange for and arranging for favorable treatment from Corporation C to Corporation A. WILSON paid these kickbacks to Capallia in several forms, including but not limited to the following:

    a.  hundreds of thousands of dollars in kickbacks paid from Corporation A to a bank account Capallia held jointly with Individual A, falsely masked as supposed payroll payments from Corporation A to Individual A, when in fact, Individual A had done virtually no work for Corporation A or WILSON;

    b.  the purchase of two automobiles by Corporation A for Capallia and Individual A;

    c.  the purchase of thousands of dollars' worth of Apple computer products and related accessories by WILSON and Corporation A for the personal use and benefit of Capallia;

    d.  the purchase by WILSON and Corporation A of tens of thousands of dollars' worth of airfare, lodging, and Caribbean cruises for Capallia, Individual A, Capallia's

11

minor children, Capallia's relatives, Capallia's friends and friends' children, and on at least one occasion, airfare and hotel accommodations for babysitters to watch Capallia's minor children; and

      e.    a $5,000 wire transfer from Corporation A's bank account to the joint account of Capallia and Individual A, which payment was in addition to the kickbacks paid through Corporation A's payroll processing company.

      38.    WILSON sought to conceal the corrupt nature of the kickbacks by falsely masking the payments to Capallia as supposed payroll payments from Corporation A to Individual A. As WILSON and Capallia well knew, however, Individual A did virtually no work for Corporation A, and the decision to place Individual A on the payroll of Corporation A was a pretext by which to funnel kickbacks from WILSON to Capallia.

      39.    WILSON and Capallia prepared a false resume in the name of Individual A designed to make it appear that WILSON had interviewed and hired Individual A to perform real work at Corporation A because of Individual A's skills and experience, and to conceal that the supposed hiring of Individual A in fact was a pretext through which to pay kickbacks to Capallia. As WILSON and Capallia knew, the false resume in the name of Individual A in truth was an altered version of Capallia's own resume, and did not reflect Individual A's actual work history or skills.

### Favorable Treatment from Capallia to Companies Owned By WILSON

      40.    In return for the kickbacks Capallia received from WILSON, Capallia agreed to arrange for and did arrange for favorable treatment from Corporation C to Corporation A. This favorable treatment included:

      a.     repeatedly issuing and requesting the issuance of purchase requisition requests and purchase orders for Corporation C to purchase goods and services from Corporation A as the subcontractor to supply goods and services to the DOD OIG under the WITS 3 contract. Capallia did so despite knowing that Corporation A lacked any experience prior to 2011 in providing information technology related services, and notwithstanding his knowledge that there was no legitimate business or economic reason to use Corporation A as a subcontractor in relation to the WITS 3 contract;

      b.     refraining from soliciting competing bids from other potential subcontractors on the WITS 3 contract, notwithstanding Corporation C's policy of seeking multiple bids or holding a formal competitive bidding process to the maximum extent practicable;

      c.     ordering and recommending that Corporation C order standard, commercially available computer software, hardware, and accessories, and routine office moving services from Corporation A—a construction company with no relevant experience or expertise in providing these goods or services—when Capallia knew that Corporation A would simply purchase those goods or services from another vendor and mark up the price, thereby needlessly inflating the cost to Corporation C, which in turn inflated the cost to the United States;

      d.     providing WILSON, Corporation A, and WILSON's subordinates at Corporation A with advanced information about anticipated orders from and competing quotes to the DOD OIG, while not providing similar information to other potential subcontractors to Corporation C;

      e.     creating false and fraudulent service order request forms to be signed by the DOD OIG's Designated Agency Representative that falsely described the goods or services

or the number of hours actually being supplied to the DOD OIG, thereby enabling Corporation A to substantially overbill Corporation C, and in turn, enabling Corporation C to substantially overbill the United States;

    f. recommending and approving the payment of invoices submitted from Corporation A to Corporation C, notwithstanding that he knew that Corporation A had not delivered or otherwise provided to the DOD OIG the goods or services appearing on the face of the false and fraudulent service order request forms that Capallia had prepared; and

    g. recommending and approving the payment of invoices submitted from Corporation A to Corporation C, notwithstanding his knowledge that Corporation A had secured and retained the business from Corporation C through kickbacks.

Bribes from WILSON to LUMHO

  41. WILSON directly and indirectly corruptly gave, offered, and promised to give tens of thousands of dollars' worth of bribes to LUMHO with the intent to influence LUMHO in the performance of official acts that would benefit Corporation A, and LUMHO demanded, sought, agreed to receive, and accepted things of value in return for being influenced in the performance of official acts that would benefit Corporation A. The bribes paid by WILSON to LUMHO included:

    a. tens of thousands of dollars in bribes paid through Corporation A's payroll processing company to a bank account in the name of Individual B, masked as supposed payroll payments from Corporation A to Individual B, when in fact, as both WILSON and LUMHO knew, Individual B had never worked for Corporation A or WILSON, and the payments were bribes to LUMHO;

14

b.     thousands of dollars' worth of bribes paid in the form of electronics and camera equipment, including but not limited to two Bose Sounddocks, a Canon digital camera, two Canon telephoto zoom lenses, a Canon flash lighting accessory, Apple computer electronics, and accessories associated with the electronics and camera equipment. These items typically were built into the costs that Corporation A charged to Corporation C, and that the co-conspirators caused Corporation C to pass on to the United States through false and fraudulent claims that falsely described the items as legitimate services being provided to the DOD OIG.

42.     LUMHO sought to conceal the corrupt nature of the bribes by creating and causing the creation of false tax, employment, and court records that made it appear that Individual B had been employed by Corporation A or its payroll company, knowing that Individual B had never done any work for Corporation A or WILSON.

Official Acts By LUMHO to Benefit Companies Owned By WILSON

43.     In return for the things of value he received directly and indirectly from WILSON and Corporation A, LUMHO agreed to perform and did perform official acts to benefit Corporation A, including:

a.     repeatedly signing WITS 3 service order request forms and ordering goods and services on behalf of the DOD OIG from Corporation C, thereby causing Corporation C to order goods and services from Corporation A;

b.     when utilizing the WITS 3 contracting vehicle, ordering from Corporation C, rather than another vendor who had been awarded a prime contract with the United States under the WITS 3 program, thereby ensuring the continued flow of revenue from Corporation C to Corporation A;

      c.      providing advice to and applying pressure on GSA officials to hire Corporation C to provide services to the DOD OIG;

      d.      using the WITS 3 contracting vehicle to order goods and services on behalf of the DOD OIG, rather than other procurement options available to the DOD OIG, thereby ensuring LUMHO's continued control over the procurement process, and continued ability to steer work to Corporation A through Corporation C;

      e.      directing LUMHO's subordinate, Public Official A, to sign WITS 3 service order request forms ordering services on behalf of the DOD OIG from Corporation C under the WITS 3 contract; and

      f.      signing service order request forms that LUMHO knew to be false and fraudulent, in that he knew that the service order request forms falsely described the goods or services or the number of hours actually being supplied to the DOD OIG.

44.      It was a further part of the conspiracy that, for the purpose of executing the scheme to defraud, WILSON, DONELSON, Capallia, and LUMHO transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds.

## CONDUCT IN FURTHERANCE OF THE CONSPIRACY

45.      In furtherance of the conspiracy, and to effect the objects thereof, the co-  .
conspirators took the following actions within the Eastern District of Virginia and elsewhere:

### WILSON Pays Kickbacks to DONELSON

46.      WILSON made payments from Corporation A to an automobile dealership in Alchua, Florida, to pay in part for automobiles being bought by and for the personal use of DONELSON, made payments from Corporation A to purchase land adjacent to DONELSON's

residence in Winchester, Virginia, to benefit DONELSON, and made payments from Corporation A and Corporation B to Corporation D (a company owned and controlled by DONELSON). Neither DONELSON nor Corporation D had provided any legitimate goods or services to WILSON or his companies to earn these payments. WILSON and DONELSON both knew that all of these payments constituted kickbacks from WILSON to DONELSON. To conceal the corrupt nature of these payments, WILSON created and caused the creation of false memo lines on many of the checks. These kickback payments included the following:

| Check Date | Payor Company | Payee | Amount | False Memo Line |
|---|---|---|---|---|
| 10/14/2010 | Corporation A | automobile dealership in Alchua, FL (payment for part of a 2010 Ford F150 for DONELSON) | $9,800.00 | "serv[ice] + truck repaired" |
| 11/22/2011 | Corporation B | Corporation D | $28,000.00 | "JEA ROW [right-of-way] Clearing" |
| 12/20/2011 | Corporation A | escrow agent (payment for the purchase of property in Winchester, VA to benefit DONELSON) | $60,000.00 | |
| 2/6/2012 | Corporation B | Corporation D | $7,250.00 | "JEA / Clearing" |
| 6/4/2012 | Corporation A | Corporation D | $44,179.00 | "ROW Clearing / Dozer Work / Rebuild line" |
| 9/18/2012 | Corporation A | Corporation D | $58,750.00 | "Hamilton Co. Proj / ROW Clearing" |
| 12/18/2012 | Corporation A | Corporation D | $75,312.00 | "ROW Clearing / Norfolk Southern / Alltel" |
| 1/3/2013 | Corporation A | automobile dealership in Alchua, FL (payment for part of a 2013 Ford F150 for DONELSON) | $20,714.41 | |
| 6/3/2013 | Corporation A | Corporation D | $69,812.00 | "Equipment Clearing / ROW" |
| 4/4/2014 | Corporation A | Corporation D | $10,000.00 | "Land Clearing; Phillips Pasture" |
| 2/12/2015 | Corporation A | Corporation D | $10,000.00 | "Phillips Pasture Tract" |

WILSON and DONELSON Create Fake Invoices to Attempt to Conceal Kickbacks

47.    WILSON and DONELSON further attempted to conceal their illegal agreement and the true nature of the kickback payments by fabricating false and fictitious invoices. The fake invoices were intended to make it appear falsely that Corporation D had provided legitimate goods or services to Corporation A and Corporation B to earn the payments from those companies, when in fact, as WILSON and DONELSON both knew, no such goods or services had been provided. The fake invoices included the following:

| Fake Invoice Date | Purportedly Billed From | Purportedly Billed To | Fake Project Name | Fake Description | Fake Invoice Amount |
|---|---|---|---|---|---|
| 10/1/2011 | Corporation D | Corporation B | "JEA" | "Clear under-brush around structures on Mills Cove/Reed Island. Clear lay-down yard, build pad to stage trucks at each structure." | $28,000.00 |
| 12/19/2011 | Corporation D | Corporation B | "JEA" | "Level Lime rock aggregate # 57 on right-of-way on east side Seven Pines Island / Neptune Substation for egress and ingress to tighten sand bed road. Rebuild ROW and clear under-brush." | $7,250.00 |
| 2/20/2012 | Corporation D | Corporation A | "F&W and Rayonier" | "Fire prevention and reforestation (Fire Plowing)"  "[Corporation A] hunting leased land – Rayonier Properties, Sweet Water. Rebuild washouts, culverts, cleared ROW on secondary roads." | $44,179.00 |
| 8/20/2012 | Corporation D | Corporation A | "Hamilton Co. Plantation" | "Hamilton County Plantation Phase I – Land clearing." | $58,750.00 |
| 11/17/2012 | Corporation D | Corporation A | "Norfolk Southern" | "[Corporation A] Hunting leased land – Rayonier Properties, Sweetwater and Jacobs. Cleared Norfolk RR/CSX RR ROW along RR tracks from Fargo to Council, GA." | $75,312.00 |
| 12/22/2012 | Corporation D | Corporation A | "Oden" | "Oden Property – Land clearing." | $22,000.00 |
| 4/30/2013 | Corporation D | Corporation A | "Hamilton Co. Plantation" | "Hamilton County Plantation Phase II – Land clearing." | $69,812.00 |
| 1/23/2015 | Corporation D | Corporation A | "Phillips Pasture" | "Phillips Pasture – Land Clearing" | $10,000.00 |

| Fake Invoice Date | Purportedly Billed From | Purportedly Billed To | Fake Project Name | Fake Description | Fake Invoice Amount |
|---|---|---|---|---|---|
| 3/6/2015 | Corporation D | Corporation A | "Phillips Pasture" | "Phillips Pasture – Land Clearing" | $10,000.00 |

### DONELSON And WILSON Execute the WITS 3 Subcontract, Amendment, and Other Subcontracts and Amendments

48.     DONELSON and WILSON executed and caused to be executed numerous subcontract agreements, and amendments to those agreements, between Corporation C and Corporation A, and between Corporation C and Corporation B.

49.     These subcontract agreements and amendments included, among others, a master service subcontract agreement entered into on or about November 18, 2010, in the Eastern District of Virginia, between DONELSON, on behalf of Corporation C, and WILSON, on behalf of Corporation A. This master service subcontract agreement contemplated that Corporation A would furnish a suite of information technology support services to Corporation C to enable Corporation C to fulfill service orders under the WITS 3 contract, notwithstanding that, as the co-conspirators knew, Corporation A then had no experience or expertise relating to information technology support services.

50.     On or about June 17, 2011, in the Eastern District of Virginia, acting on behalf of Corporation C, DONELSON executed an amendment to the master service subcontract agreement with WILSON, acting on behalf of Corporation A. The amendment broadened the labor categories available under the subcontract to include executive assistant services, notwithstanding that, as the co-conspirators well knew, neither WILSON nor Corporation A had any meaningful experience or expertise in that area.

51.     DONELSON also executed each of the following subcontract agreements and amendments to those subcontracts on behalf of Corporation C with companies owned and

controlled by WILSON. The subcontracts and amendments were executed by DONELSON in the Eastern District of Virginia on or about the following dates:

| Approx. Date Executed | Contract / Amendment No. | Subcontractor | Summary of Scope of Work | Contract / Amendment Value |
|---|---|---|---|---|
| 7/7/2010 | 07-MLN-10 | Corporation A | fiber optic installation work in and near Durham, NC | $493,919 |
| 11/18/2010 | 09-MLN-10 | Corporation A | established Corporation A as a subcontractor to provide professional services under the WITS 3 contract | indefinite quantity; actual billings exceeded $16,000,000 |
| 4/28/2011 | 15-MLN-11 | Corporation A | fiber optic installation work in and near Kearneysville, WV | $281,338 |
| 5/9/2011 | 19-MLN-11 | Corporation A | fiber optic installation work in and near McLean, VA | $308,198 |
| 6/17/2011 | 09-MLN-10 Amd. 1 | Corporation A | amendment broadening the labor categories available under the WITS 3 subcontract with Corporation A (amendment to contract executed on 10/18/2010) | indefinite quantity; actual billings exceeded $16,000,000 |
| 11/3/2011 | 34-MLN-11 | Corporation B | fiber optic installation work in and near Clarksville, VA | $2,223,039 |
| 2/17/2012 | 15-MLN-12 | Corporation A | fiber optic installation work in and near Durham, NC | $346,796 |
| 3/1/2012 | 22-MLN-12 | Corporation A | fiber optic installation work in and near Nashville, TN | $2,470,713 |
| 3/2/2012 | 25-MLN-12 | Corporation A | fiber optic installation work in and near Hanscom AFB | $2,764,870 |
| 3/6/2012 | 32-MLN-12 | Corporation A | fiber optic installation work in and near Philadelphia, PA | $463,195 |
| 3/6/2012 | 21-MLN-12 | Corporation B | fiber optic installation work in and near Jacksonville, FL | $2,270,614 |
| 9/21/2012 | 59-MLN-12 | Corporation A | fiber optic installation work in Washington, DC | $2,106,534 |
| 9/21/2012 | 60-MLN-12 | Corporation A | fiber optic installation work in Washington, DC | $197,328 |
| 9/21/2012 | 63-MLN-12 | Corporation A | fiber optic installation work in and near Big Pool, MD, Charles Town, WV, and Shenandoah Junction, WV | $42,415 |
| 10/2/2012 | 34-MLN-11 Amd. 2 | Corporation B | fiber optic installation work in and near Clarksville, VA (second amendment to contract executed on 11/3/2011) | increased contract value to $3,623,252 |
| 10/15/2012 | 21-MLN-12 Amd. 1 | Corporation B | fiber optic installation work in and near Jacksonville, FL (amendment to contract executed on 3/6/2012) | increased contract value to $2,588,422 |

| Approx. Date Executed | Contract / Amendment No. | Subcontractor | Summary of Scope of Work | Contract / Amendment Value |
|---|---|---|---|---|
| 1/19/2013 | 32-MLN-12 Amd. 1 | Corporation A | fiber optic installation work in and near Philadelphia, PA (amendment to contract executed on 3/6/2012) | increased contract value to $948,929 |
| 5/24/2013 | 18-MLN-13 | Corporation A | fiber optic installation work in and near Ashburn, VA | $106,285.34 |
| 8/8/2013 | 32-MLN-12 Amd. 2 | Corporation A | fiber optic installation work in and near Philadelphia, PA (amendment to contract executed on 3/6/2012) | increased contract value to $1,781,999 |
| 8/12/2013 | 25-MLN-12 Amd. 1 | Corporation A | fiber optic installation work in and near Hanscom AFB (amendment to contract executed on 3/2/2012) | increased contract value to $6,929,562 |

### WILSON Pays Kickbacks to Capallia

52.     WILSON paid numerous kickbacks to Capallia in return for Capallia arranging to provide and providing favorable treatment from Corporation C to companies controlled by WILSON. These kickbacks included the following things of value provided from WILSON directly and indirectly to Capallia.

53.     In or about March 2012, WILSON placed Capallia's spouse, Individual A, on the payroll of Corporation A, notwithstanding that Individual A was then performing no actual work for Corporation A. Both WILSON and Capallia understood that the nominal job for Individual A was in truth a pretext through which to pay kickbacks to Capallia. Beginning in or about March 2012, and continuing thereafter through in or about July 2015, WILSON caused Corporation A to make bi-weekly payments through its payroll processing company into a bank account held jointly by Capallia and Individual A. These payments cumulatively totaled more than $500,000. Throughout this multi-year period, Individual A did no more than a few hours of actual work for WILSON or Corporation A.

54.     In or about March 2012, and at times thereafter through in or about November 2013, WILSON paid kickbacks to Capallia by causing Corporation A to purchase over $60,000

21

worth of airfare, hotel accommodations, and Caribbean cruises for Capallia, Individual A, Capallia's minor children, Capallia's relatives, Capallia's friends and friends' children, and on at least one occasion, airfare and hotel accommodations for babysitters to watch Capallia's minor children. WILSON caused Corporation A to pay for all of the following:

   a. airfare and hotel accommodations in or about March 2012 for Capallia, Individual A, Capallia's minor children, and two additional adult family members of Capallia to fly to Orlando and stay at the Walt Disney World Grand Floridian Resort for four nights;

   b. airfare and cruise tickets for a trip scheduled in May 2012 for Capallia, Individual A, and Capallia's minor children to fly to Orlando and travel on a seven-day Disney Caribbean cruise;

   c. airfare in November and December 2012 for Capallia, Individual A, Capallia's minor children, and airfare and cruise tickets for two adult friends of Capallia and the friends' minor children to fly to Orlando and travel on a seven-day Disney Caribbean cruise;

   d. airfare in or about April 2013 for Capallia, Individual A, and Capallia's minor children to fly to Jacksonville. As a part of this trip, on or about April 5, 2013, Capallia flew from Washington Dulles International Airport, in the Eastern District of Virginia, to Jacksonville International Airport;

   e. airfare and cruise tickets in or about July 2013 for Capallia, Individual A, Capallia's minor children, two adult friends of Capallia, and the friends' minor children to fly to Orlando and travel on a seven-day Disney Caribbean cruise. As a part of this trip, on or about July 26, 2013, Capallia flew from Washington Dulles International Airport, in the Eastern District of Virginia, to Orlando International Airport; and

f. airfare and hotel accommodations in or about November 2013 for Capallia, Individual A, Capallia's minor children, and two babysitters to fly to Orlando and stay at the Walt Disney World Grand Floridian Resort for seven nights. As a part of this trip, on or about November 30, 2013, Capallia flew from Washington Dulles International Airport, in the Eastern District of Virginia, to Orlando International Airport.

55. On or about March 7, 2012, WILSON caused Corporation A to pay approximately $43,336.74 to an automobile dealership in Winchester, Virginia, to purchase a 2012 Chrysler Town & Country for Capallia. To conceal the corrupt nature of this payment, and to make it appear falsely that this payment was a legitimate expense of Corporation A, WILSON wrote a false memo line on the check indicating that it was for "Equipment." As both WILSON and Capallia knew, the Town & Country would not be used to perform any actual work for Corporation A, but instead was a kickback to Capallia.

56. On or about June 30, 2012, WILSON caused Corporation A to purchase an Apple MacBook Pro and additional computer software and accessories for Capallia, with a total combined value of over $1,500.

57. On or about July 2, 2012, WILSON caused Corporation A to purchase an Apple iPad and another Apple MacBook Pro for Capallia, with a total combined value of over $2,000.

58. On or about August 8, 2012, WILSON caused Corporation A to pay approximately $41,585.65 to an automobile dealership in Winchester, Virginia, to purchase a 2012 Jeep Grand Cherokee for Capallia. To conceal the corrupt nature of this payment, and to make it appear falsely that this payment was a legitimate expense of Corporation A, WILSON wrote a false memo line on the check indicating that it was for "Truck Repairs." As both

WILSON and Capallia knew, the Grand Cherokee would not be used to perform any actual work for Corporation A, but instead was a kickback to Capallia.

59.   On or about June 25, 2013, WILSON caused Corporation A to send a $5,000 wire transfer from Corporation A's bank account to the joint account of Capallia and Individual A. This payment was in addition to the bi-weekly kickback payments WILSON caused Corporation A's payroll processing company to send to Capallia's account. Both WILSON and Capallia understood this payment to be a kickback.

### Capallia Provides Favorable Treatment to Companies Owned By WILSON

60.   In return for the kickbacks Capallia received from WILSON, Capallia agreed to arrange for and did arrange for favorable treatment from Corporation C to Corporation A. This favorable treatment included the following.

61.   Beginning no later than January 2012, and continuing through at least January 2013, within the Eastern District of Virginia, Capallia created and caused the creation of over 100 purchase requisition requests and purchase orders from Corporation C to Corporation A in connection with the WITS 3 contract, thereby assuring a constant flow of revenue from Corporation C to Corporation A for goods and services supplied in relation to the WITS 3 contract. Capallia did so notwithstanding his knowledge that Corporation A lacked any experience or expertise prior to 2011 in performing the services or delivering the goods called for under the WITS 3 contract. In many instances, Capallia created and caused the creation of these purchase requisition requests and purchase orders despite his knowledge that Corporation A would not provide the services listed on the face of the associated service order request forms signed by representatives of the DOD OIG. Moreover, Capallia repeatedly caused Corporation

C to issue purchase orders to Corporation A, despite the absence of a legitimate business or economic reason to involve Corporation A in these transactions.

<u>WILSON Pays Bribes To LUMHO</u>

62.     WILSON repeatedly paid bribes to LUMHO in return for official acts from LUMHO to benefit WILSON and his companies.  These bribes included the following.

63.     In or about January 2012, WILSON placed LUMHO's father-in-law, Individual B, on the payroll of Corporation A, notwithstanding that Individual B was then performing no actual work for Corporation A.  Both WILSON and LUMHO understood that the nominal job for Individual B was in truth a pretext through which to pay bribes to LUMHO in return for LUMHO performing and promising to perform official acts to benefit WILSON and his companies.  Beginning in or about February 2012, and continuing thereafter through in or about October 2012, WILSON caused Corporation A's payroll processing company to issue checks made payable in the name of Individual B.  Throughout this period, as WILSON and LUMHO both knew, Individual B did no actual work for Corporation A, and the checks in truth were bribes to LUMHO.

64.     LUMHO received these checks and deposited and caused them to be deposited in the Eastern District of Virginia into a bank account in the name of Individual B that LUMHO controlled.  Among other dates, on or about October 15, 2012, at Burke, within the Eastern District of Virginia, LUMHO deposited and caused to be deposited a check from Corporation A's payroll processing company made payable to Individual B into an account in the name of Individual B, knowing that the check constituted a bribe from WILSON to LUMHO.

65.     On or about March 30, 2012, WILSON caused the purchase of two Bose Sounddocks to be used to bribe LUMHO.  WILSON arranged to have these items delivered to

LUMHO indirectly by having them shipped to the residence of Individual C, an employee of Corporation A, who resided in Ashburn, Virginia. .

66.     On or about June 26, 2012, WILSON purchased and caused the purchase of a Canon digital camera, two Canon telephoto zoom lenses, a Canon flash lighting accessory, Apple computer electronics, and accessories associated with the electronics and camera equipment, having a cumulative value of over $12,000. WILSON arranged to have these items delivered to LUMHO indirectly by having them shipped to the residence of Individual C.

### LUMHO Creates And Causes the Creation of False Records to Make Individual B's Fake Job With Corporation A Appear Real

67.     LUMHO further sought to conceal his corrupt agreement with WILSON by creating false documentation that made it appear that Individual B's fake job with Corporation A was real. For example, in or about July 2012, Individual B was required to appear in Prince William County General District Court in connection with a charge of driving while intoxicated. LUMHO attended those proceedings with Individual B. When that court was deciding what limitations to impose on the use of Individual B's driver's license, LUMHO supplied the court with false information that Individual B was then employed by Corporation A, and that the court's order needed to permit Individual B to travel to and from Corporation A's supposed office in Manassas, Virginia. As LUMHO knew, Individual B was never employed by Corporation A, and Corporation A did not have an office in Manassas.

68.     In a further effort to conceal his corrupt agreement with WILSON, on or about February 2, 2013, in the Eastern District of Virginia, LUMHO created and caused the creation of fake tax documentation in the name of Individual B that made it appear that Individual B had been employed by Corporation A or its payroll processing company during 2012.

### WILSON, Capallia, And LUMHO Create And Cause the Creation of False And Fraudulent Service Order Request Forms, Portal Orders, And Cause the Submission of False Claims to the United States

69.     In several instances the co-conspirators arranged for the creation of false, fictitious, and fraudulent service order request forms and associated WITS 3 portal orders that purported to identify services that the DOD OIG was ordering under the WITS 3 contract from Corporation C. As the co-conspirators knew, the fraudulent service order request forms and WITS 3 portal orders were being used to conceal that the co-conspirators were arranging for Corporation A to buy standard, commercially available items such as computer software, hardware, and accessories, and routine office moving services, significantly inflating the price to Corporation C and to the DOD OIG, and then falsely billing the government as though it had been supplied with various professional services that could be ordered under the WITS 3 contract. In so doing, the co-conspirators enabled Corporation A to reap substantial profits from transactions where there was no legitimate business or economic reason to involve Corporation A, and where it provided no or virtually no value to the United States. In several instances, these false and fictitious service order request forms and associated WITS 3 portal orders were used as a pretext through which to pay for equipment that WILSON was providing to LUMHO directly and indirectly as bribes.

70.     Among others, WILSON and Capallia prepared and caused the preparation of the false and fraudulent service order request forms and associated WITS 3 portal orders identified below, knowing that they were false, and LUMHO approved or directed the approval of the false and fraudulent service order request forms associated with the portal orders identified below, likewise knowing that they were false:

| Portal Order No. | Portal Order Date | Fraudulent CLIN Description | Claimed Hours | Hourly Rate Charged to GSA | Total Billed to GSA | Actual Goods / Services Supplied |
|---|---|---|---|---|---|---|
| 5631 | 1/31/2012 | "Cable Installer" | 4,171 | $106.09 | $442,501.39 | office moving services |
| 5890 | 4/3/2012 | "Cable Installer" | 755 | $106.09 | $80,097.95 | office moving services |
| 5911 | 4/11/2012 | "Application Project Manager" | 942 | $245.71 | $231,458.82 | Niksun, Adtran, Cisco, and Transition computer equipment |
| | | "LAN/WAN Integrator" | 862 | $141.25 | $121,757.70 | |
| | | "LAN/WAN Integrator" | 862 | $141.25 | $121,757.70 | |
| | | Total for Portal Order 5911: | 2,666 | | $474,974.22 | |
| 6034 | 5/31/2012 | "Cable Installer" | 978 | $70.73 | $69,173.94 | Samsung flat screen monitors; Bose Sounddock equipment used to bribe LUMHO |
| 6070 | 6/4/2012 | "Cable Installer" | 1,130 | $70.73 | $79,924.90 | Microsoft webcams; wall mounts; white boards |
| 6090 | 6/14/2012 | "Cable Installer" | 768 | $70.73 | $54,320.64 | Apple computer and Canon photography equipment used to bribe LUMHO |
| 6098 | 6/21/2012 | "Cable Installer" | 596 | $70.73 | $42,155.08 | wall mounting equipment for television monitors |
| 6099 | 6/21/2012 | "Cable Installer" | 296 | $70.73 | $20,936.08 | Canon photography equipment used to bribe LUMHO |
| 6100 | 6/21/2012 | "Senior Telecommunications Specialist" | 1,706 | $196.02 | $334,410.12 | Polycom teleconferencing equipment and accessories |
| | | "Senior Telecommunications Specialist" | 1,706 | $196.02 | $334,410.12 | |
| | | Total for Portal Order 6100 | 3,412 | | $668,820.24 | |
| 6129 | 7/19/2012 | "Cable Installer" | 2,174 | $70.73 | $153,767.02 | cabling equipment |
| 6130 | 7/19/2012 | "Cable Installer" | 2,734 | $70.73 | $193,375.82 | Hewlett Packard electronic storage media |
| 6142 | 7/24/2012 | "LAN/WAN Integrator" | 822 | $148.31 | $121,910.82 | office moving services |
| 6192 | 8/8/2012 | "Master Subject Matter Expert – CIO" | 1,803 | $383.91 | $692,189.73 | Cisco software support and services |

71.     Moreover, the co-conspirators knew that the preparation and submission of these false service order request forms and WITS 3 portal orders would cause the submission of false, fictitious, and fraudulent invoices from Corporation C to the GSA and the DOD OIG, as each monthly invoice from Corporation C to the GSA incorporated the charges from the prior month's service orders.  WILSON, Capallia, and LUMHO submitted and caused to be submitted false, fictitious, and fraudulent invoices from Corporation C to the GSA on or about March 1, 2012, May 1, 2012, June 1, 2012, July 1, 2012, and September 1, 2012.

LUMHO And Capallia Seek to Obscure the Fraudulent Nature of the Service Orders

72.     LUMHO and Capallia also routinely sought to obscure the fraudulent nature of the service orders, and that several of the service orders were being used as a pretext through which to pay bribes to LUMHO.

73.     For example, on or about June 7, 2012, WILSON sent an email to Capallia stating, "add your cost to this and send it to Kekoa." WILSON then identified the following products and quantities:

| Product Description: | Qty |
|---|---|
| MBP [MacBook Pro] 15.4/CTO | 1 |
| CANON EOS 60D DIGITAL SLRW/1 | 1 |
| EYE-FI PRO X2 8GB SD CARD | 1 |
| APPLE MAGSAFE AIRLINE ADAPTER | 1 |
| IPAD WI-FI CELLULAR 64GB WHITE | 7 |
| XTREMEMAC INCHARGE X2 | 1 |
| APPLE REMOTE DESKTOP 3.3 10 | 1 |
| MOSHI CARDETTE ULTRA SDXC MEDI | 1 |

74.     WILSON intended that several of these items, including the MacBook Pro, the Canon digital camera, and the Apple iPads be provided to LUMHO as bribes.

75.     On or about June 11, 2012, Capallia prepared a draft service order request form for the DOD OIG to purchase services from Corporation C, knowing that this draft service order request form was false and fraudulent. The draft service order request form falsely described the item being ordered by the DOD OIG as 768 hours of service from a "Cable Installer," at a rate of $70.73 per hour, for a total cost of $54,320.64. The draft service order request form also falsely represented that these services were for "technical support – Apple Cable Installation" for the supposed installation of the following products, all of which were identified on the face of the draft service order as follows:

| Product Description: | Units: |
|---|---|
| MBP 15.4/CTO | 1 |
| CANON EOS 60D DIGITAL SLRW/1 | 1 |
| EYE-FI PRO X2 8GB SD CARD | 1 |
| APPLE MAGSAFE AIRLINE ADAPTER | 1 |
| IPAD WI-FI CELLULAR 64GB WHITE | 7 |
| XTREMEMAC INCHARGE X2 | 1 |
| APPLE REMOTE DESKTOP 3.3 10 | 1 |
| MOSHI CARDETTE ULTRA SDXC MEDI | 1 |

76.    As Capallia knew, neither Corporation A nor Corporation C in fact would deliver cable installation services in relation to any of those products, which require no professional services to install.  Instead, Capallia knew that Corporation A would purchase the Apple and Canon products from a retailer, mark up the price, and arrange to have those items delivered directly or indirectly to LUMHO.

77.    On or about June 11, 2012, Capallia transmitted the draft service order request form to LUMHO.  LUMHO knew that the draft service order request form was false, that there was no legitimate reason for the DOD OIG to purchase several of these items, and that the Apple MacBook Pro, the Canon digital camera, and the Apple iPads were intended as bribes from WILSON to LUMHO.

78.    LUMHO also recognized that the draft false service order, as initially written, was too explicit about the nature and circumstances of the fraud and bribery.  Accordingly, on or about June 12, 2012, LUMHO called Capallia and instructed him to "remove all the line items from the order and send it back to me."

79.    In response, on or about June 12, 2012, Capallia prepared a revised service order request form that omitted the itemized description of Apple and Canon equipment.  Capallia knew that this revised service order request form likewise was false and fraudulent, in that it

continued to falsely describe the item being ordered by the DOD OIG as 978 hours of service from a "Cable Installer," at a rate of $70.73 per hour, for a total cost of $69,173.94.

80.   On or about June 12, 2012, Capallia transmitted the revised false service order request form to LUMHO. LUMHO knew that the revised service order request form was false, and that it was being used as a pretext through which to route bribes from WILSON to him. LUMHO nevertheless signed the revised service order request form knowing that it was false, and returned it to Capallia, knowing that this would result in a false claim being presented to the United States.

LUMHO Falsifies A Letter To Conceal the Corrupt Bargain

81.   On or about April 20, 2012, LUMHO created a falsified letter in an attempt to conceal the scheme and to legitimize his actions in ordering virtually all services under the WITS 3 contract from Corporation C. On that day, LUMHO sent an email to Capallia attaching what purported to be a letter from LUMHO to a contracts manager at Corporation C. The document purported to have a date of March 2, 2011, and stated:

> As the Designated Agency Representative for the Regional Contracting Office National Capital Region (RCO NCR), I would like to take this opportunity to advise you of our selection of [Corporation C] under [the] WITS3 Contract . . . as our preferred provider for the following WITS3 services:
>
> Professional Services and Customer Premises Equipment
>
> Pursuant to this Fair Opportunity Notification Letter, I hereby certify that funding for orders associated with this notification will be obligated, prior to order issuance, in accordance with Federal Government and RCO NCR procurement laws, policies, and regulations.

82.   As LUMHO well knew, this letter was backdated. LUMHO further understood that he was not a Designated Agency Representative for any entity known as the "Regional Contracting Office National Capital Region." LUMHO also knew that he had no authority to

unilaterally select one vendor over another as the preferred provider on behalf of the DOD OIG, and that the DOD OIG had not conducted a competitive process by which all WITS 3 vendors were invited to submit bids to become the DOD OIG's preferred provider of professional services or customer premises equipment.

<u>Capallia Seeks to Ensure That WILSON's Companies Are Paid by Corporation C</u>

83.     Capallia repeatedly sought to ensure that Corporation C paid Corporation A for invoices submitted in connection with the WITS 3 contract, knowing that in certain instances Corporation A had not and would not deliver the services reflected on the face of the service order request forms from the DOD IG. Capallia further understood that by ensuring that Corporation A had a steady stream of income from Corporation C, WILSON would have ample funds to pay kickbacks to Capallia.

84.     On or about November 18, 2012, within the Eastern District of Virginia, Capallia sent an email to the accounting department of Corporation C directing that it pay an invoice from Corporation A, for the fulfillment of WITS 3 service order 6129, notwithstanding that he knew that Corporation A had not provided and would not provide Corporation C or the DOD OIG with the services identified on the face of that service order.

85.     On or about November 18, 2012, within the Eastern District of Virginia, Capallia sent an email to the accounting department of Corporation C directing that it pay an invoice from Corporation A for the fulfillment of WITS 3 service order 6192, notwithstanding that he knew that Corporation A had not provided and would not provide Corporation C or the DOD OIG with the services identified on the face of that service order.

86. On or about November 19, 2012, within the Eastern District of Virginia, Capallia sent an email to a coworker at Corporation C requesting that over 70 invoices from Corporation A related to the WITS 3 contract be paid.

87. On or about November 20, 2012, in the Eastern District of Virginia, Capallia sent an email to WILSON with details on how Corporation A should prepare invoices to be billed to Corporation C under the WITS 3 contract and subcontract.

88. On or about January 25, 2013, in the Eastern District of Virginia, Capallia sent an email to WILSON and an employee of Corporation A with instructions for how to revise an invoice to be submitted to Corporation C related to the WITS 3 contract.

89. On or about January 25, 2013, in the Eastern District of Virginia, Capallia sent a series of emails to the accounting department of Corporation C directing that it pay various invoices received from Corporation A related to the WITS 3 contract.

90. On or about February 4, 2013, in the Eastern District of Virginia, Capallia sent an email to the accounting department of Corporation C directing that it pay an invoice received from Corporation A related to the WITS 3 contract.

91. On or about March 12, 2013, in the Eastern District of Virginia, Capallia sent a series of emails to the accounting department of Corporation C directing that it pay various invoices received from Corporation A related to the WITS 3 contract.

92. On or about June 4, 2013, in the Eastern District of Virginia, Capallia sent an email to the accounting department of Corporation C directing that it pay an invoice received from Corporation A related to the WITS 3 contract.

(In violation of Title 18, United States Code, Section 1349).

## COUNTS 2 - 4

(Wire Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

93.     Paragraphs 1 through 27 of this Indictment are realleged and incorporated by reference as though set forth in full herein.

94.     Beginning no later than July 2010, and continuing through at least July 2015, in the Eastern District of Virginia and elsewhere,

WILLIAM S. WILSON,
also known as "Bill,"
TIMOTHY R. DONELSON, and
MATTHEW KEKOA LUMHO,

defendants herein, along with Ronald A. Capallia, Jr., Individual C, and others known and unknown to the grand jury, did knowingly devise and intend to devise a scheme and artifice to defraud: (a) by depriving another of the intangible right of honest services through bribes and kickbacks; and (b) by obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises.

95.     The scheme to defraud is described in paragraphs 30 through 92 of this Indictment, which paragraphs are re-alleged and incorporated as if fully set forth herein.

### Executions

96.     On or about the dates listed below, for the purpose of executing the above-described scheme, in the Eastern District of Virginia and elsewhere, the following defendants transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds, as described below:

| Count | Approx. Date | Defendants Charged | Description |
|---|---|---|---|
| 2 | 10/30/2012 | WILLIAM S. WILSON, also known as "Bill," TIMOTHY R. DONELSON, and MATTHEW KEKOA LUMHO | a purchase requisition request submitted by Capallia requesting that a purchase order be issued to Corporation A, which was transmitted electronically from the Eastern District of Virginia to a data center maintained by Corporation C outside of Virginia |
| 3 | 11/18/2012 | WILLIAM S. WILSON, also known as "Bill," and TIMOTHY R. DONELSON | an email sent from Capallia in the Eastern District of Virginia, through a data center maintained by Corporation C outside of Virginia, with a subject line of "[Company A] Invoice $118,000," directing that Corporation C's accounting department pay an invoice from Corporation A for the fulfillment of WITS 3 service order 6129 |
| 4 | 11/18/2012 | WILLIAM S. WILSON, also known as "Bill," and TIMOTHY R. DONELSON | an email sent from Capallia in the Eastern District of Virginia, through a data center maintained by Corporation C outside of Virginia, with a subject line of "[Company A] Invoice $209,401.99," directing that Corporation C's accounting department pay an invoice from Corporation A for the fulfillment of WITS 3 service order 6192 |

(In violation of Title 18, United States Code, Sections 1343 and 2.)

## COUNT 5

(False Claims)

THE GRAND JURY FURTHER CHARGES THAT:

97.     Paragraphs 1 through 27 of this Indictment are realleged and incorporated by reference as though set forth in full herein.

98.     On or about March 1, 2012, within the Eastern District of Virginia, and elsewhere,

WILLIAM S. WILSON,
also known as "Bill," and
MATTHEW KEKOA LUMHO,

defendants herein, along with Ronald A. Capallia, Jr., made, presented, and caused to be made or presented to a department or agency of the United States, namely, the General Services Administration, any claim upon or against the United States, or any department or agency thereof, namely, a monthly WITS 3 invoice from Corporation C, knowing that such claim was false, fictitious, and fraudulent, in that the invoice sought payment for cable installer services that had not been provided.

(In violation of Title 18, United States Code, Sections 287 and 2.)

## COUNT 6

(False Claims)

THE GRAND JURY FURTHER CHARGES THAT:

99.     Paragraphs 1 through 27 of this Indictment are realleged and incorporated by reference as though set forth in full herein.

100.    On or about May 1, 2012, within the Eastern District of Virginia, and elsewhere,

WILLIAM S. WILSON,
also known as "Bill," and
MATTHEW KEKOA LUMHO,

defendants herein, along with Ronald A. Capallia, Jr., made, presented, and caused to be made or presented to a department or agency of the United States, namely, the General Services Administration, any claim upon or against the United States, or any department or agency thereof, namely, a monthly WITS 3 invoice from Corporation C, knowing that such claim was false, fictitious, and fraudulent, in that the invoice sought payment for cable installer services that had not been provided.

(In violation of Title 18, United States Code, Sections 287 and 2.)

## COUNT 7

(False Claims)

THE GRAND JURY FURTHER CHARGES THAT:

101.   Paragraphs 1 through 27 of this Indictment are realleged and incorporated by reference as though set forth in full herein.

102.   On or about June 1, 2012, within the Eastern District of Virginia, and elsewhere,

WILLIAM S. WILSON,
also known as "Bill," and
MATTHEW KEKOA LUMHO,

defendants herein, along with Ronald A. Capallia, Jr., made, presented, and caused to be made or presented to a department or agency of the United States, namely, the General Services Administration, any claim upon or against the United States, or any department or agency thereof, namely, a monthly WITS 3 invoice from Corporation C, knowing that such claim was false, fictitious, and fraudulent, in that the invoice sought payment for LAN/WAN integrator services, applications project manager services, and cable installer services that had not been provided.

(In violation of Title 18, United States Code, Sections 287 and 2.)

## COUNT 8

(False Claims)

THE GRAND JURY FURTHER CHARGES THAT:

103.    Paragraphs 1 through 27 of this Indictment are realleged and incorporated by reference as though set forth in full herein.

104.    On or about July 1, 2012, within the Eastern District of Virginia, and elsewhere,

WILLIAM S. WILSON,
also known as "Bill," and
MATTHEW KEKOA LUMHO,

defendants herein, along with Ronald A. Capallia, Jr., made, presented, and caused to be made or presented to a department or agency of the United States, namely, the General Services Administration, any claim upon or against the United States, or any department or agency thereof, namely, a monthly WITS 3 invoice from Corporation C, knowing that such claim was false, fictitious, and fraudulent, in that the invoice sought payment for cable installer services and senior telecommunications specialist services that had not been provided.

(In violation of Title 18, United States Code, Sections 287 and 2.)

## COUNT 9

(False Claims)

THE GRAND JURY FURTHER CHARGES THAT:

105.    Paragraphs 1 through 27 of this Indictment are realleged and incorporated by reference as though set forth in full herein.

106.    On or about September 1, 2012, within the Eastern District of Virginia, and elsewhere,

WILLIAM S. WILSON,
also known as "Bill," and
MATTHEW KEKOA LUMHO,

defendants herein, along with Ronald A. Capallia, Jr., made, presented, and caused to be made or presented to a department or agency of the United States, namely, the General Services Administration, any claim upon or against the United States, or any department or agency thereof, namely, a monthly WITS 3 invoice from Corporation C, knowing that such claim was false, fictitious, and fraudulent, in that the invoice sought payment for cable installer services, LAN/WAN integrator services, and master subject matter expert - CIO services that had not been provided.

(In violation of Title 18, United States Code, Sections 287 and 2.)

**COUNT 10**

(Bribery of a Public Official)

THE GRAND JURY FURTHER CHARGES THAT:

107.   Paragraphs 1 through 27 of this Indictment are realleged and incorporated by reference as though set forth in full herein.

108.   Beginning no later than February 2012, and continuing through at least on or about October 15, 2012, within the Eastern District of Virginia, and elsewhere,

WILLIAM S. WILSON,
also known as "Bill,"

defendant herein, did directly and indirectly, knowingly and corruptly give, offer, and promise things of value, namely, approximately $23,595.12 in checks from the payroll processing company of Corporation A made payable to Individual B, and electronics and camera equipment, including two Bose Sounddocks, a Canon digital camera, two Canon telephoto zoom lenses, a Canon flash lighting accessory, Apple computer electronics, and accessories associated with the electronics and camera equipment, with a total value of approximately $13,252.48, to MATTHEW KEKOA LUMHO, a public official, with intent to influence LUMHO in the performance of official acts on an as-needed basis in relation to the WITS 3 contract. These official acts included: (i) ordering goods and services from Corporation C through the WITS 3 contract, thereby causing Corporation C to order goods and services from Corporation A; (ii) ordering from Corporation C, rather than another vendor who had been awarded a prime contract with the United States under the WITS 3 program, thereby ensuring the continued flow of revenue from Corporation C to Corporation A; (iii) providing advice to and applying pressure on GSA officials to hire Corporation C to provide services to the DOD OIG; (iv) using the WITS 3 contracting vehicle to order goods and services on behalf of the DOD OIG, rather than other

procurement options available to the DOD OIG, thereby ensuring LUMHO's continued control over the procurement process, and continued ability to steer work to Corporation A through Corporation C; (v) directing LUMHO's subordinate, Public Official A, a public official, to sign WITS 3 service order request forms ordering services from Corporation C under the WITS 3 contract; and (vi) approving service order request forms that LUMHO knew to be false and fraudulent, in that he knew that the service order request forms falsely described the goods or services or the number of hours actually being supplied to the DOD OIG.

(All in violation of Title 18, United States Code, Sections 201(b)(1)(A) and 2.)

## COUNT 11

(Acceptance of Bribes by a Public Official)

THE GRAND JURY FURTHER CHARGES THAT:

109.    Paragraphs 1 through 27 of this Indictment are realleged and incorporated by reference as though set forth in full herein.

110.    Beginning no later than February 2012, and continuing through at least on or about October 15, 2012, within the Eastern District of Virginia, and elsewhere,

### MATTHEW KEKOA LUMHO,

defendant herein, being a public official, did directly and indirectly, knowingly and corruptly demand, seek, receive, accept, and agree to receive and accept things of value, namely, approximately $23,595.12 in checks from the payroll processing company of Corporation A made payable to Individual B, and electronics and camera equipment, including two Bose Sounddocks, a Canon digital camera, two Canon telephoto zoom lenses, a Canon flash lighting accessory, Apple computer electronics, and accessories associated with the electronics and camera equipment, with a total value of approximately $13,252.48, in return for promising to perform and performing official acts on an as-needed basis in relation to the WITS 3 contract. These official acts included: (i) ordering goods and services from Corporation C through the WITS 3 contract, thereby causing Corporation C to order goods and services from Corporation A; (ii) ordering from Corporation C, rather than another vendor who had been awarded a prime contract with the United States under the WITS 3 program, thereby ensuring the continued flow of revenue from Corporation C to Corporation A; (iii) providing advice to and applying pressure on GSA officials to hire Corporation C to provide services to the DOD OIG; (iv) using the WITS 3 contracting vehicle to order goods and services on behalf of the DOD OIG, rather than other

procurement options available to the DOD OIG, thereby ensuring LUMHO's continued control over the procurement process, and continued ability to steer work to Corporation A through Corporation C; (v) directing LUMHO's subordinate, Public Official A, a public official, to sign WITS 3 service order request forms ordering services from Corporation C under the WITS 3 contract; and (vi) approving service order request forms that LUMHO knew to be false and fraudulent, in that he knew that the service order request forms falsely described the goods or services or the number of hours actually being supplied to the DOD OIG.

(All in violation of Title 18, United States Code, Sections 201(b)(2)(A) and 2.)

## COUNT 12

(False Statements)

THE GRAND JURY FURTHER CHARGES THAT:

111.    Paragraphs 1 through 27 of this Indictment are realleged and incorporated by reference as though set forth in full herein.

112.    On or about February 11, 2013, within the Eastern District of Virginia,

### MATTHEW KEKOA LUMHO,

defendant herein, did knowingly and willfully make and use a false writing and document knowing the same to contain any materially false, fictitious, and fraudulent statement and entry in a matter within the jurisdiction of the executive branch of the Government of the United States, namely, preparing and submitting an OGE Form 450 representing falsely that he had received no non-investment income and no gifts during 2012.

(In violation of Title 18, United States Code, Section 1001(a)(3).)

## COUNT 13

(False Statements)

THE GRAND JURY FURTHER CHARGES THAT:

113.    Paragraphs 1 through 27 of this Indictment are realleged and incorporated by reference as though set forth in full herein.

114.    On or about June 3, 2016, at Alexandria, within the Eastern District of Virginia,

TIMOTHY R. DONELSON,

defendant herein, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, namely, falsely asserting that payments from Corporation A and Corporation B to Corporation D were compensation for the use of equipment supplied by DONELSON and companies he owned in whole or in part.

(In violation of Title 18, United States Code, Section 1001(a)(2).)

FORFEITURE NOTICE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE FOR FORFEITURE, AS

DESCRIBED BELOW:

115.   Pursuant to Federal Rule of Criminal Procedure 32.2(a), the defendants

WILLIAM S. WILSON, TIMOTHY R. DONELSON, and MATTHEW KEKOA LUMHO are

hereby notified that, if convicted of any of the offenses alleged in Counts 1 through 4 and 10

through 11 of the Indictment, the defendants shall forfeit to the United States, pursuant to 18

U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, constituting or

derived from proceeds obtained directly or indirectly as the result of the Count or Counts of

conviction. That property includes, but is not limited to the following:

    a.    Real Property located at 10 E MAIN STREET, LAKE BUTLER, FLORIDA 32054-2138 (UNION COUNTY), Parcel #30-05-20-13-006-0181-0;

    b.    Real Property located at: 5572 SW 111th LANE, LAKE BUTLER, FLORIDA 32054 (UNION COUNTY), Parcel #20-06-19-47-000-0660-0;

    c.    Real Property located at 6305 KINGSLEY LAKE DRIVE, STARKE, FLORIDA 32091-9734 (CLAY COUNTY), Parcel #16-06-23-000587-000-00;

    d.    Real Property located at 5600 SW CR18-A, LAKE BUTLER, FLORIDA 32054 (UNION COUNTY), PARCEL #23-06-19-00-000-0032-0;

    e.    2006 Peterbilt Conventional 379 Tractor Truck bearing VIN 1XP5DBEX46N647376;

    f.    2011 Vactron Air LP555SDT with Trailer bearing Serial # 5HZBF16281LE11432;

    g.    2011 Vermeer CS800GT bearing Serial # 5HZBF1922BLJB2265;

    h.    2012 Custom Trailer 22 Ton Capacity (Vermeer) Serial # 1L9PU1923CG423965;

    i.    2013 Ford F150 bearing VIN 1FTFW1EF6DFA65546;

      j.       2014 Ford F250 bearing VIN 1FT7W2BT6EEA89373;

      k.       2014 Ford F250 bearing VIN 1FT7W2BTXEEA30410;

      l.       2014 International TerraStar Truck bearing VIN 1HTKPSKKXEH489341;

      m.     Vermeer D24x40 II Navigator with Rubber Tracks bearing Serial # 1VRZ19031C1001420; and

      n.     Vermeer RTX1250 Plow bearing Serial # 1VR6110R1B1001148.

116.    If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute property, including but not limited to the following:

      a.      A sum of money equal to at least $15,730,250.23 in United States currency, representing the amount of proceeds obtained as a result of the offenses.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

A TRUE BILL

                                                                                _____

FOREPERSON OF THE GRAND JURY

Dana J. Boente
United States Attorney

By:       _____

Matthew Burke
Samantha P. Bateman
Assistant United States Attorneys
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981

48

FORM OBD-34
APR. 91

No.: 1:17CR222

# UNITED STATES DISTRICT COURT

*Eastern District of Virginia*

*Alexandria Division*

THE UNITED STATES OF AMERICA

*vs.*

WILLIAM SAM WILSON, a/k/a "Bill",
TIMOTHY RAYMOND DONELSON, and
MATTHEW KEKOA LUMHO,

## INDICTMENT

Count 1: 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud)
Counts 2-4: 18 U.S.C. § 1343 (Wire Fraud)
Count 5-9: 18 U.S.C. § 927 (False Claims)
Count 10:   18 U.S.C. § 201 (Bribery of a Public Official)
Count 11:   18 U.S.C. § 201(b)(2)(A) (Acceptance of Bribes by a Public Official)
Counts 12-13:  18 U.S.C. § 1001 (False Statements)
Forfeiture

_____
*A true bill.*

_____
*Foreman*

*Filed in open court this 3rd day of October, 2017.*

_____
*Clerk*

Bail, $_____